Filed 10/31/22  P. v. Kessinger CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br>v.<br><br>KALEB JORDAN KESSINGER,<br><br>        Defendant and Appellant. | A165834<br><br>(Kern County<br>Super. Ct. No. BF172058A) |

Defendant Kaleb Kessinger beat to death his girlfriend's two-year-old son, Ramon Angel Reyes Chavez, and buried him in a rural area.  A jury convicted Kessinger of first degree murder, assault on a child causing death, and two other charges stemming from his attempts to evade arrest.  He was sentenced to 25 years to life in prison.

Kessinger's sole claim on appeal is that his murder conviction cannot stand because there was insufficient evidence of premeditation and deliberation.  To the contrary, the evidence showed that Kessinger pummeled Ramon's head, prevented Ramon from receiving emergency medical care, and took elaborate steps to cover up the crime once Ramon had died.  There was also evidence that Kessinger disliked Ramon and had previously hurt him.  Taken as a whole, this constituted substantial evidence from which a reasonable jury could have found Kessinger guilty of first degree murder.  Therefore, we affirm.

1

# I.
## FACTUAL AND PROCEDURAL
## BACKGROUND

*A.     Background*

Ramon was born on February 24, 2016, to Ayled Chavez and Carlos Reyes.  Chavez and Reyes were in a relationship, but they broke up the following year.  At the time of the murder in April 2018, Ramon and Chavez, who was in her late teens, lived with Chavez's mother, stepfather, sister, sister's boyfriend, and two-year-old niece in Bakersfield.  Reyes and Chavez did not have a formal custody agreement, but Reyes usually saw his son "every weekend."

In February 2018, Chavez met then 21-year-old Kessinger through SnapChat, and they began dating.  Kessinger lived with his brother and brother's child in a house about 20 minutes away from Chavez's home.  Chavez testified that by the following month, her relationship with Kessinger got "pretty weird."  After the two cheated on each other, Kessinger convinced Chavez to start having sex with other men for money.  Chavez was in love with Kessinger and believed that if she did so he would stay with her.

Kessinger arranged dates for Chavez through a website, Backpage, and told her how long to stay and how much to charge.  Chavez testified that she gave most of the proceeds of this work to Kessinger, who had an open court case and wanted money to hire an attorney.  Once, when a client "didn't pay [her] and [she] still did the job," Kessinger "got really mad and . . . tried . . . swinging on [her] but . . . stopped himself from doing it."

While Chavez was on dates, she left Ramon with Kessinger, who did not "want to pay for a babysitter."  Sometimes, Ramon was with Kessinger in Kessinger's car for hours while they waited for her.  Chavez testified that when Ramon fussed or cried, Kessinger "would yell at him" and tell him to be

2

quiet. Ramon understood only Spanish, and Kessinger was frustrated that his attempts to "control" the child and "calm him down" did not work.

According to Chavez, Kessinger disliked Ramon. She explained that Kessinger "would make little comments that [Ramon] looked too much like his dad and why didn't he look more like [Chavez]." Chavez testified, and Reyes corroborated, that Kessinger and Reyes argued over FaceTime and in person. Reyes testified that when he called to talk to his son, Kessinger repeatedly told him to stop contacting Chavez. Once, when Chavez was at Reyes's house to pick up Ramon, Kessinger "kicked [Reyes's] door in" and the men got into a fistfight.

Several days before the murder, Chavez noticed "bruises" and dried blood behind Ramon's ears, as if they had been cut. Chavez's sister also observed dried blood on the back of one of Ramon's ears, describing the wound as "pretty bad," as if "someone stretched his ear." Chavez's sister had lived with Ramon since he was three months old and had never seen other indications of abuse or witnessed Chavez mistreat him. Reyes also testified that he never had any reason to suspect that Chavez hurt their son.

B.    *The Night of the Murder*

Ramon spent the weekend before the murder with Reyes, and Chavez picked him up on Monday, April 23. Both Reyes and Chavez testified that Ramon did not have any injuries to his face or head when he returned to Chavez's care. Ramon spent the rest of the day with Chavez at their home, and Chavez's sister saw him there that morning. She likewise did not notice any injuries on him.

The following day, April 24, Chavez had plans to see a man she met on Facebook, who was a stripper who performed at bachelorette parties, to discuss the possibility of her also becoming a stripper. She arranged for

3

Kessinger to care for Ramon while she met the man, and Kessinger picked the child up from her house around 8:00 p.m. Chavez testified that Ramon was "being fussy and crying" because he "didn't want to go with [Kessinger]," whom he "didn't like." Soon afterward, she texted Kessinger asking him to send her a video of Ramon so she could see if he had stopped crying, but Kessinger would not.

The man from Facebook picked Chavez up around 9:00 p.m., and they parked at a store across the street from her home and talked. Chavez told the man she had problems with Kessinger and wanted to get out of sex work, and the man encouraged her to "stop doing what [she] was doing" and go back to school. The man testified that Chavez told him she was scared of Kessinger and wanted to leave him.

Chavez and the man then picked up food, and he dropped her off at her home shortly before 11:00 p.m. Chavez testified that while talking to the man, she had decided to leave Kessinger, and she texted Kessinger to let him know she was home because she wanted to get Ramon from him. After Kessinger said he was coming to pick her up, she again asked him to send her a video of Ramon. Kessinger said that Ramon was sleeping.

Around 11:15 p.m., Kessinger picked up Chavez in his car, a black BMW. She was surprised to see that Ramon was not in the car, since Kessinger "would always have [Ramon] with him" if she left her son in his care. Chavez asked where Ramon was, and Kessinger said he was sleeping at Kessinger's house and Kessinger's brother was there. Kessinger was "quiet" as he drove them back to the house, although he told Chavez he had "accidentally hit" Ramon with the car door.

Upon reaching Kessinger's house, Kessinger and Chavez went into Kessinger's bedroom. The room was dark and "smelled like a lot of blood."

4

Chavez tried to turn on the lights, but Kessinger would not let her. They began arguing, and Kessinger told her to be quiet so she would not wake up Ramon, whom she could hear "snoring." Kessinger and Chavez went outside and continued arguing, and she told him she did not want to be with him. Chavez testified that Kessinger then drove them to "a field" some distance away and "told [her] there's a spot right there where he could bury [her]. And, basically, [was] just telling [her] to keep [her] mouth quiet."

The two returned to Kessinger's house and went to his bedroom. Chavez touched Ramon, who was on the bed, and observed that he was naked and felt "really cold." She used the light from her cell phone to look at him and saw that he "had a black eye, . . . his face was really swollen," and there was a cut on the back of his head. At this point, Kessinger took away her phone. He said that what happened to Ramon "was an accident," but she responded that "it looked like he purposely did it."

Chavez quickly dressed Ramon and told Kessinger to take them to the hospital. They got in the car, and Kessinger told her "to make something up because they [were] gonna think it was him" who hurt Ramon. Chavez, who was holding Ramon, told Kessinger she did not care and directed him to go to the hospital. Kessinger was "driving so slow," and Chavez was screaming at him to go faster but "knew he wasn't gonna take [her]" there. Chavez then felt Ramon become "really calm" and stop breathing. "[P]anicking" and "in shock," she tried unsuccessfully to perform CPR on him.

After Chavez told Kessinger that Ramon had stopped breathing, Kessinger drove them back to his house instead of continuing to the hospital. Chavez was "angry" and demanded that Kessinger "tell [her] what really happened," but he again denied he had done anything wrong. At the house, Chavez waited in the car with Ramon's body while Kessinger went inside.

Chavez testified that Kessinger quickly returned to the car and then drove them to his friend's house. She waited in the car while he went inside, staying at least 20 minutes. Chavez claimed that she did not leave or try to seek help because she "was scared." In particular, she was worried that Kessinger had a gun, even though the police had seized some guns from him as part of his court case.

From the friend's house, Kessinger drove Chavez to Democrat Hot Springs, a resort area that she estimated to be an hour away. He parked the car, retrieved Ramon's body, and left, taking the car keys. It was "pitch dark," and Chavez could not see anything after Kessinger turned off the car lights.[1] She did not try to follow him or leave, because she was "scared" and "felt like he would have killed [her] too . . . if [she] were to even try to run."

Chavez testified that sometime later Kessinger returned to the car without Ramon. Kessinger drove them back to his house, and they went into his bedroom and had sex. He then "wrapped his arm around [Chavez's] head" and told her to go to sleep. Chavez testified that she waited for him to fall asleep so that she could leave, but he stayed awake.

C.    *Kessinger's Attempts to Cover up the Murder and Evade Arrest*

Chavez eventually fell asleep and woke up later on the morning of April 25. Kessinger still had her cell phone, and she was afraid to try to escape because she thought he would catch her and kill her. During the day, she saw Kessinger walking back and forth with clothes and blankets and heard him doing laundry. She also witnessed him burning something plastic in the garage and saw blood in a bathroom drain.

_____

[1] A surveillance camera at Democrat Hot Springs recorded the BMW arriving around 5:15 a.m., when it was still dark outside, and leaving about 20 minutes later. This left a significant amount of time unaccounted-for in Chavez's narrative.

Chavez testified that later that afternoon, she and Kessinger drove back to Democrat Hot Springs so that he could bury Ramon. Kessinger, who had a shovel with him, parked and left Chavez in the car. While he was gone, another man arrived and parked nearby. Chavez directed the man to the restroom, but she did not seek help from him because she was scared that Kessinger might come back and "hurt [them] both." Kessinger eventually returned with the shovel, and they drove back to his house.[2]

At some point that day, Kessinger told Chavez that he did not want to "go to jail for murder," and he decided that she should make a false report to police that Ramon was kidnapped. Chavez was angry and yelled at Kessinger, but he remained so calm that it was "scary." He told her not to "do nothing stupid" and said he knew where her niece lived, implying he would hurt that child if she did not cooperate.

In accordance with his plan, later that night Kessinger dropped Chavez off near her old residence in Bakersfield. When she got out of the BMW, he handed her Ramon's diaper bag, which had apparently been in the car since Kessinger originally picked up Ramon the night before. Chavez went to the nearest house, knocked on the door, and asked to use the telephone. She then called 911 and reported that a "Mexican" man in a black truck had grabbed Ramon from her while she was walking home from a store.

One of the Bakersfield police officers who responded to the kidnapping report, which was made around 8:45 p.m., testified that Chavez's statements about what happened "were not matching up with [her] facial expressions and . . . demeanor." Although Chavez claimed a stranger had taken her child,

_____

[2] Due to a power outage, the surveillance camera did not record the BMW arriving at the parking lot, but the vehicle was recorded leaving at around 6:00 p.m.

7

she seemed "aloof" and had "a thousand-mile stare." After the officer "pressed her" on inconsistencies, Chavez "changed her original story" and reported that she had argued with her boyfriend and he had driven away with her son. Finally, she changed her story again, saying "that she had not seen her son in about two days and that the last person she knew to be with her son was . . . her boyfriend."

After Chavez reported that Ramon was with Kessinger, the police drove her to Kessinger's house. Some time later, Kessinger passed by in the BMW, and Chavez alerted the police to his presence. Officers attempted to stop the BMW, but it "started accelerating at a high rate of speed" and drove away. During the ensuing pursuit, the BMW reached speeds of up to 100 miles per hour and was used to commit other traffic violations, including running a stop sign.

A different officer joined the chase and saw the BMW enter an intersection "at a high rate of speed" and turn. When he "arrived at the intersection a few seconds later," he saw the BMW flipped over on its roof on the sidewalk. No one was inside the car, and the police were unable to capture a person seen running away from the scene.

The police interviewed Chavez three times, the first early on the morning after the BMW crashed, the second several hours later, and the last after she herself was arrested.[3] After telling the police that Kessinger had buried Ramon's body, Chavez directed them to a place near Six Flags Magic

---

[3] Chavez ultimately pleaded no contest to one count of willful cruelty to a child under Penal Code section 273a, subdivision (a), and served about a year in prison. She was not promised any leniency in exchange for her statements. Chavez admitted that she lied to the police repeatedly, and her interviews and testimony contained numerous inconsistencies. We do not discuss her credibility problems in detail because they do not affect our analysis.

Mountain, which is in a different direction from Bakersfield than Democrat Hot Springs. A few hours later, however, she directed them to the correct location. Ramon's body was found along a trail, several hundred feet from the parking lot.

Early the following morning, Kessinger was arrested at a Bakersfield motel. When officers entered the room where he was staying and attempted to arrest him, he refused to follow their commands. One of the officers shot him with a Taser, and another officer struck him with a baton. Kessinger continued to resist, at one point grabbing the baton and trying to kick the officers. Finally, after striking Kessinger several more times, the officers were able to take him into custody.

D. *Physical Evidence and Ramon's Autopsy*

Blood was found in numerous locations throughout Kessinger's house. It was on the arm of one of the living room couches, a mirrored wall in the living room, and "a small pop-up child-type clothes hamper" in the same area. There was "blood spatter" on a baseboard near the bedrooms, and the carpet nearby had been cleaned but had a bloodstain on the other side. "[S]everal droplets" of blood were on a pillow in Kessinger's bedroom, and inside the bedroom closet was a bag of clothing with dirt and bloodstains on it. DNA testing confirmed that blood in all these locations belonged to Ramon.

Consistent with Chavez's testimony, burnt plastic material was located in and near Kessinger's garage. A shovel like the one Chavez described Kessinger having was found in the house. In addition, there was a shotgun in a hall closet and a rifle in the garage, supporting Chavez's claim that she was afraid of Kessinger.

The forensic pathologist who performed Ramon's autopsy testified that Ramon died from blunt force head trauma. "[T]he upper two-thirds of his

9

face [was] purple" from "one great big bruise," and there was extensive bruising on the side and back of his head and neck. Indeed, other than on "the top of the scalp," he had bruising "everywhere else on the head." His eyes were bruised and swollen shut, and he had abrasions on his face, neck, and upper body. There was also a large, deep laceration on his scalp, which was "definitely a point of impact."

An internal examination revealed "severe injuries resulting from severe hard impacts to [Ramon's] head." Ramon had a "massive subgaleal hemorrhage" directly under the scalp, a subdural hemorrhage in the area under the skull, and "two large" subarachnoid hemorrhages in the area directly above the brain. The brain itself was swollen and herniated, and the cerebral spinal fluid was bloody. The pathologist testified that Ramon's condition was not consistent with an accident or a single impact from a car door.

### E.     Procedural History

Kessinger was charged with felony counts of first degree murder, assault on a child causing death, and recklessly evading a peace officer, and a misdemeanor count of resisting a peace officer.[4] The jury convicted him of all the charges. In September 2020, he was sentenced to a total term of 25 years to life in prison, composed of a term of 25 years to life for the murder and concurrent terms of three years for recklessly evading an officer and 180 days in jail for resisting an officer. A term of 25 years to life for the assault on a child causing death was imposed and stayed.

---

[4] The charges were brought under Penal Code sections 187, subdivision (a) (murder), 273ab, subdivision (a) (assault on a child causing death), and 148, subdivision (a)(1) (resisting an officer), and Vehicle Code section 2800.2 (evading an officer). All further statutory references are to the Penal Code.

Kessinger appealed, and the matter became fully briefed in November 2021. On August 9, 2022, the appeal was transferred from the Fifth District Court of Appeal to this court for decision.

## II.
### DISCUSSION

*A.    General Legal Standards*

1.    Standard of review

In determining whether substantial evidence supports a conviction, " 'we review the whole record to determine whether . . . [there is] substantial evidence to support the verdict . . . such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.]  In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence.' " (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.)  " 'The testimony of one witness, if believed, may be sufficient to prove any fact' " (*People v. Johnson* (2019) 32 Cal.App.5th 26, 57), and "we do not reweigh the evidence or reevaluate the credibility of witnesses."  (*People v. Hernandez* (2011) 200 Cal.App.4th 1000, 1004.)  Reversal is required only if " 'it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." ' " (*People v. Cravens* (2012) 53 Cal.4th 500, 508.)

These principles apply equally to proof of specific intent. (*People v. Manibusan*, *supra*, 58 Cal.4th at p. 87.)  " '[E]vidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction.' " (*Ibid.*)  Thus, " '[w]e "must accept logical inferences that the jury might have drawn from the circumstantial evidence" ' " (*ibid.*), although "a reasonable inference from the evidence ' " 'may not be based on suspicion alone, or on imagination,

11

speculation, supposition, surmise, conjecture, or guess work.' " ' " (*People v. Wear* (2020) 44 Cal.App.5th 1007, 1020.)

2.      The law of first degree murder

The prosecution's sole theory for first degree murder was that Ramon's killing was "willful, deliberate, and premeditated." (§ 189, subd. (a).) "In the context of first degree murder, ' "premeditated" means "considered beforehand," and "deliberate" means "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action." ' " (*People v. Lee* (2011) 51 Cal.4th 620, 636.) Although "it is not necessary to prove the defendant maturely and meaningfully reflected upon the gravity of the defendant's act" (§ 189, subd. (d)), the killing must have " ' "occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse." ' " (*People v. Potts* (2019) 6 Cal.5th 1012, 1027.) " 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.' " (*Ibid.*)

In *People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*), the Supreme Court "developed guidelines to aid reviewing courts in assessing the sufficiency of evidence to sustain findings of premeditation and deliberation." (*People v. Halvorsen* (2007) 42 Cal.4th 379, 419–420.) *Anderson* explained that the evidence typically found sufficient to prove premeditation and deliberation "falls into three basic categories: (1) facts about how and what [the] defendant did prior to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts about the defendant's prior relationship and/or conduct with the victim from

12

which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]; (3) facts about the nature of the killing from which the jury could infer that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take [the] victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2)." (*Anderson*, at pp. 26–27, italics omitted.)

Generally, a first degree murder verdict will be upheld " 'when there is evidence of all three types,' " or " 'at least extremely strong evidence of [planning] or evidence of [motive] in conjunction with [evidence of] either [planning] or [manner of killing].' " (*People v. Halvorsen*, *supra*, 42 Cal.4th at p. 420.) But the *Anderson* factors "need not be present in any particular combination to find substantial evidence of premeditation and deliberation" (*People v. Stitely* (2005) 35 Cal.4th 514, 543), and "reviewing courts need not accord them any particular weight." (*Halvorsen*, at p. 420.)

B.   *Substantial Evidence Supports the First Degree Murder Conviction.*

Kessinger claims that "there is insufficient evidence to support a finding of first degree murder based on the three *Anderson* factors." Although we agree with him that there was little evidence of planning, plenty of other evidence supported a finding that the murder was premeditated and deliberate.

To begin with, the evidence permitted a reasonable inference that Kessinger had a motive to kill Ramon. Chavez testified that Kessinger did not like her son, and she described Kessinger's impatience when Ramon was

13

fussy or cried. Indeed, the injuries to Ramon's ears suggested that Kessinger had previously harmed the child. Kessinger also disliked Reyes and discouraged Reyes's contact with Chavez, even though that contact was unavoidable because Reyes and Chavez shared custody of Ramon. And finally, although Kessinger was willing to babysit, Chavez's testimony suggested he did so because he wanted her to earn as much money for him as possible. Based on this evidence, the jury could infer that Kessinger had personal and financial reasons to want Ramon dead. (See *People v. Lopez* (2018) 5 Cal.5th 339, 355 [evidence of motive to kill child where defendant "complained of the financial strain from having to take care of [her]" and engaged in "escalating acts of abuse"].)

The manner of Ramon's killing also supports the inference that Kessinger acted with premeditation and deliberation. As Kessinger correctly observes, "brutality alone cannot show premeditation; a brutal killing is as consistent with a killing in the heat of passion as with a premeditated killing." (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1238.) But Ramon was killed by numerous severe blows to his upper body, mostly his head, evincing a focused attack on a vulnerable area. Indeed, he had injuries on all sides of his head, suggesting a prolonged beating during which Kessinger "had ample opportunity to consider the deadly consequences of his actions." (*People v. Stitely*, *supra*, 35 Cal.4th at p. 544.)

Moreover, the actions taken by Kessinger "after he inflicted the fatal wounds also support[] the inference that he deliberately intended to kill [Ramon]." (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 202.) In *Whisenhunt*, the Supreme Court found sufficient evidence of premeditation and deliberation where, after the child victim's mother "returned home to find her daughter grievously injured, [the] defendant initially dissuaded [the

14

mother] from seeking medical help by lying to her about the nature and extent of [the child's] injuries, and then actively prevented her from calling 911 until after [the child] died." (*Ibid.*) Likewise, Kessinger lied to Chavez about Ramon's injuries, stopped her from turning on the light to look at her son, took away her cell phone after she saw Ramon was seriously hurt, and drove to the hospital so slowly that Ramon died before they could get there. Thus, Kessinger actively prevented Ramon from receiving medical care, permitting a reasonable inference that the murder was deliberate.

Finally, Kessinger's other conduct after beating Ramon also supports the conclusion that the murder was deliberate and premeditated, not "a rash, impulsive killing." (*People v. Perez* (1992) 2 Cal.4th 1117, 1128.) Kessinger took elaborate steps to cover up the murder by burying Ramon's body in a remote location, cleaning and burning evidence of the crime, threatening Chavez and her family, planning the false report that Ramon was kidnapped, and evading and resisting the police. This evidence shows that, far from being "surprised and dismayed by what he had done, as one who acted impulsively might be," Kessinger engaged in cold, calculated acts to avoid responsibility for the murder. (*People v. Potts*, *supra*, 6 Cal.5th at p. 1028.) Although Kessinger's post-crime conduct alone cannot establish the required mens rea, it buttresses the jury's finding that he acted with deliberation and premeditation when he killed Ramon. (See *Perez*, at p. 1128.)

In short, there was evidence that Kessinger had a motive to kill Ramon, deliberately attacked him in a manner likely to cause death, prevented him from receiving medical care until he died, and then single-mindedly pursued a plan to get away with the crime. Taken together, this constituted substantial evidence that the murder was premeditated and deliberate.

15

# III.
## DISPOSITION

The judgment is affirmed.

_____

Humes, P.J.


WE CONCUR:



_____

Margulies, J.



_____

Banke, J.



*People v. Kessinger*  A165834


17